FILED
2026 Sep-30 PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

**JOHN SPERGER, *et al*,**
Plaintiffs,

**v.**

**UNITED STATES OF AMERICA,**
Defendant.

**Case No. 4:23-cv-1626-CLM**

# MEMORANDUM OPINION

John Sperger ("Sperger") was leading a motorcycle group when he collided with Brandi Chambers, who was driving her Jeep Patriot while delivering mail for the United States Postal Service ("USPS"). Sperger and his wife Krista sue the United States under the Federal Tort Claims Act ("FTCA"); Sperger for his past and future injuries, and Krista for loss of consortium. The parties agreed at trial that the case turns on which side of the road the collision occurred: If the vehicles collided in Sperger's lane, then Chambers was negligent and the Government is liable. If they collided in Chambers' lane, then Sperger was (contributorily) negligent, and the Government owes nothing.

The court held a four-day bench trial, then had the parties file post-trial briefs. As required by Rule 52(a), the court makes special fact findings, followed by conclusions of law. In sum, the court finds:

- Chambers negligently crossed into Sperger's side of the road.
- Chambers' negligence caused the collision.
- Sperger was not contributorily negligent.
- The Government owes John Sperger these damages:
  - Past medical expenses: $603,981.36
  - Past physical pain and mental anguish: $850,000
  - Future physical pain and mental anguish: $425,000
  - Permanent injuries and disfigurement: $180,000
- Krista Sperger proved her loss of consortium claim.
- The Government owes Krista $175,000 in consortium damages.

## I.

## FINDINGS OF FACT

The court makes its Rule 52(a)(1) fact findings below. Many are taken from the parties' undisputed facts. *See* (doc. 47, pp. 3-6) (pretrial order). The rest are the court's findings based on the evidence presented at trial.

### A. The Collision

1. John Sperger's motorcycle collided with Brandi Chambers' Jeep Patriot SUV around 11:30am on June 17, 2021.

2. The accident occurred on this portion of County Road 114 in rural Cherokee County:




3. The road has no painted center line and is about 14 feet wide.

4. The speed limit at the point of impact was 45 mph. While the court cannot find Sperger's speed with certainty, the court does not find that Sperger was speeding, and the Government presented no evidence or argument that Sperger's speed contributed to the collision.

5. The accident occurred during the day, and the weather was clear, so visibility and weather were not contributing factors.

6. Sperger was driving a 2009 Kawasaki Concours 14 motorcycle.

7. Sperger was leading a group of four more motorcycle riders: Sheldon Gerbig, Bill Picard, Kyle Pfaffendorf, and Cary Uecke.

8. As the leader, Sperger drove along the right part of the left tire track of previous vehicles, as approximated by these yellow lines—first from Sperger's vantage point before cresting the hill, then from Chambers' view:





9. Sperger was driving within his lane when he crested the hill.

10. At the time of the collision, Chambers was delivering mail for USPS in her personal Jeep Patriot SUV.

11. Chambers' Jeep was not fitted for steering on the passenger's side, so Chambers sat above the arm rest between the driver's and passenger's seat, with her legs straddling the center console:



12. From this position, Chambers operated the steering wheel with her left arm, and she operated the brake and gas pedals with her left leg, so that she could reach outside the passenger's window with her right arm.

13. Chambers' center-driving position makes it difficult for Chambers to see whether her front left bumper is over a center line.

14. As Sperger and his group approached the hill on the far side of this photo, Chambers was turning right out of the gravel driveway to the right:



15. Chambers pulled her Jeep nearly perpendicular to the county road, as shown in this drawing from her deposition:



16. From this starting position, Chambers could not turn right without crossing the center line.

17. Chambers pulled into the road to turn right and crossed the center line into Sperger's lane of traffic.

18. Sperger crested the hill and hit Chambers' Jeep while Chambers was still in her turn (*i.e.*, the Jeep had yet to align within the right-hand lane).

19. Sperger hit the front left side of Chambers' Jeep and Chambers' front left tire, careened right, and slid off the road.

20. This photo shows the impact point on Chambers' Jeep and the resting position of the vehicles after the collision, with the red circle showing where Sperger's motorcycle finally stopped:




21. This photo shows the damage to Chambers' front left wheel:



**B. Impact on John Sperger**

22. Sperger suffered many physical injuries: an open comminuted left mid tibia and fibular fracture, a closed mid left femur fracture, a left posterior acetabular fracture without dislocation, vascular insufficiency of the left lower extremity requiring fasciotomy, acute blood loss anemia, bilateral acute/ subacute cerebral infarcts (strokes) resulting in left-sided hemiplegia, an acute kidney injury, and respiratory failure.

23. Sperger was hospitalized in the Floyd Medical Center in Rome, Georgia from June 17, 2021, to July 23, 2021.

24. Sperger was intubated for 15 to 17 days, and he suffered five days of failed extubation attempts.

25. Sperger suffered delirium with recurring hallucinations.

26. Sperger went through four orthopedic surgeries to his left hip, pelvis, femur, tibia, and fibula.

27. Dr. Chad Beck was Sperger's treating orthopedic trauma surgeon at Floyd.

28. Sperger's Floyd team initially planned to have Sperger remain at Floyd for inpatient rehab after receiving a needed skin graft.

29. Sperger's family, however, wanted Sperger to rehab nearer their home in Wisconsin. So Dr. Beck coordinated Sperger's transfer to Froedtert Rehab Hospital in Milwaukee, Wisconsin.

30. Sperger received the skin graft at Floyd on July 9, 2021.

31. Krista Sperger arranged for her husband to be medically flown by Aviation West Charters on a fixed-wing air ambulance from Georgia to Wisconsin on July 23, 2021.

32. Sperger remained in inpatient rehabilitation at Froedtert for about two weeks. During that time, he suffered severe hip pain and took six attempts to successfully get into a mock car (a prerequisite for his discharge).

33. Sperger was ultimately discharged and suffered an excruciating 1.5-hour drive home.

34. Sperger slept on a bed in his dining room for two months. Sperger suffered severe hip pain during this time that prevented normal sleep because Sperger could not lie in a comfortable position.

35. During the time Sperger slept in the dining room, Sperger suffered emotional turmoil that included thoughts of suicide and verbal cries to God to either take his leg or his life.

36. Krista and her son hid Sperger's firearms and ammunition during this time.

37. Sperger received counseling for PTSD-like symptoms during his second year of recovery.

38. Eventually, Sperger started crawling backwards, then using a wheelchair, then a cane, and finally began driving in January 2022.

39. Sperger continued physical therapy for about two years on his gait, his shoulder, and his range of motion.

40. Sperger's toe pain required a carbon-fiber insert.

41. Sperger still receives treatment for his back and hip misalignment and clawed toes.

42. Sperger will suffer a limp and limited range of motion for life.

43. Sperger will likely suffer long-term arthritis in his hip.

44. Sperger maintains hardware in his tibia, fibula, femur, and pelvis that Sperger can feel when sitting or lying on his left side.

45. Sperger still suffers from clawed toes that require him to walk on his nails, causing pain on each step.

46. Sperger still suffers from hand tremors and a reduced grip that cause him to drop items.

47. Sperger has visual scarring from the surgeries and the skin graft on much of the lower left side of his body and a divot on the back of his head.

48. Sperger can no longer ride a motorcycle and has been forced to give up most physical activities that he enjoyed before the accident.

49. Sperger must sit to dress and sleeps prone with his feet off the bed.

50. Sperger had to sell his home with a large lot because he could no longer maintain the home.

51. Sperger cannot travel long distances by car or air and needs breaks when traveling.

**C. Impact on Krista Sperger**

52. Krista learned of the crash by voicemail and arrived at Floyd on the fourth day.

53. Krista watched the failed extubations on her first trip to Floyd.

54. Sperger didn't recognize Krista on her second trip to Floyd.

55. While Sperger was hospitalized, Krista managed the household and home-schooled the couple's daughter while maintaining employment.

56. Once Sperger came home, Krista changed his dressings twice a day and photographed his wounds for Sperger's medical team.

57. Krista heard Sperger's nightly cries from the dining room.

58. Krista and Sperger have lost much of their shared physical life (*e.g.*, hiking, biking, tennis), and their intimacy is "different" since the accident.

59. Krista oversees the financial and insurance decisions because of Sperger's strokes.

60. Krista started therapy for anxiety and fear and believes the ordeal has negatively impacted her physical health.

**D. Financial Impact**

61. At the time of the collision, Sperger had health insurance with Anthem Blue Cross / Blue Shield ("BCBS").

62. Floyd Medical Center's billing records show that the initial total billed amount for Sperger's medical treatment was $621,463.50. On August 6, 2021, Floyd Medical Center billing records reflect the initial billed amount was reduced by $279,658.57 under the hospital's agreement with BCBS. As a result, the new billed amount was $341,804.93.

63. On December 27, 2021, the operator of Floyd Medical Center filed a "Hospital Lien" in Floyd County Superior Court "on all sums and amounts, whether in property or money, paid to the above named patient or his legal representative, by any persons, firms, insurers or corporations, including those specifically named above, if any, as a settlement, as a release, or as a consideration to a covenant not to sue, when said sum or amounts represent damages or compensation for the patient's injuries for which Floyd Healthcare Mgmt. d/b/a Atrium Health Floyd has rendered its services to such injuries." The lien amount was $341,804.93, which is equal to the Floyd Medical Center billed amount following the adjustment under the hospital's agreement with Blue Cross Blue Shield.

64. On July 7, 2023, the attorney for the operator of Floyd Medical Center signed a certification titled "RELEASE OF SATISFIED LIEN" that stated, "this Lien has been satisfied" and authorizing "the Clerk of the Superior Court to cancel this lien of record as of this day."

65. Anthem BCBS claims a subrogation amount of $382,375.83 related to the treatment Sperger has received for the injuries caused by the accident. Sperger must repay this amount from any recovery.

66. In addition to the subrogation amount owed to Anthem BCBS, Sperger owes the following to medical providers for treatment Sperger received for the injuries related to the collision:

| | | |
|---|---|---|
| a) | Floyd Physicians, LLC | $15,443.00 |
| b) | Etowah Emergency Physicians | $1,500.00 |
| c) | G. Marc Wetherington | $3,001.53 |
| d) | Ripon Medical Center | $603.00 |
| e) | Chiroplus Healthcare | $450.00 |

67. BCBS denied Sperger's claim to reimburse the air ambulance as not medically necessary. Sperger thus owes $200,608.00 to Aviation West Charters, LLC, for transportation from Georgia to Wisconsin.

## II.

## CONCLUSIONS OF LAW

The FTCA allows private individuals to sue the United States for injuries caused by negligent or wrongful acts of a government employee "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Chambers was acting within the scope of her USPS employment when she collided with Sperger, so the court will apply Alabama law to Sperger's negligence claim and Krista's claim for loss of consortium. *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001).

In Part A, the court explains how the Spergers proved their claims by a preponderance of the evidence, and the Government failed to prove its affirmative defense of contributory negligence. In Part B, the court assesses damages for each Sperger.

### A. Merits Findings

The court starts with Sperger's claim that Chambers negligently caused the collision because Krista's consortium claim hinges on its outcome.

#### 1. John Sperger's negligence claim

Sperger pleaded two theories of Chambers' negligence: (a) Chambers negligently crossed the center line and hit Sperger, and (b) Chambers negligently chose to exit the driveway on the east end, where a tree obstructed her view of the hill, rather than the western end with more visibility. (Doc. 47, pp. 6-8) (pretrial order). As for the "crossing the center line" theory, the Government pleaded two affirmative defenses of contributory negligence: (a) Sperger, not Chambers, crossed the center line, and (b) Sperger was speeding. (*Id.*, pp. 11-12). But at trial, the Government presented no argument about speed and instead limited its defense to the 'center line' theory.

So, as the court confirmed at trial, Sperger's "crossing the center line" negligence theory, and the Government's affirmative defense of contributory negligence, boil down to which side of the road the court determines the

collision happened. *See* (doc. 52, pp. 27-28) (Government opening statement) (doc. 50, pp. 105-06) (both sides confirming). Because the court finds below that the collision occurred on Sperger's side of the road, the court finds that Chambers acted negligently under Sperger's first theory and therefore does not address Sperger's alternative "wrong end of the driveway" theory.

The court explains its finding in two parts. First, the court explains how the eyewitness testimony and physical evidence prove by a preponderance that the collision occurred in Sperger's lane as Chambers was turning right. Second, the court explains why the Government expert's 'vehicle fluid spatter' theory cannot shift the scales back in the Government's favor.

**a) Eyewitness and Physical Evidence**

1. *The eyewitnesses*: Sperger does not remember the collision, so the court starts with the two motorcycle riders immediately behind Sperger (*i.e.*, the only two riders to see the collision). But first, the court shows the scene, as the large tree beside the driveway factors into each witness's testimony:



Sheldon Gerbig was second in the line of five riders. Gerbig testified that, "as soon as we came over the hump," he saw Chambers "sw[i]ng out a little wide to get around that tree." (Doc. 49-475, p. 9). Gerbig similarly told the officer who arrived at the scene that Chambers "swung out quite a ways to get

around the tree" and thus the collision was "on his side." (Doc. 53, p. 143) (describing body cam video, Joint Ex. 18).

Bill Picard was third in line and was cresting the hill when the collision happened. Picard similarly remembered the "huge, really wide tree" and testified that he "saw that red Jeep pull out and she seemed to cross over the center of the road, even though there were no lane indicators." (Doc. 49-474, p. 17). Picard testified that he saw Sperger hit Chambers' front left bumper as it was still making its right turn. (*Id.*, pp. 18-19).

Even Chambers admitted at trial that she *could* have been on Sperger's side of the road when they collided:

> Q. And with regard to where the collision occurred, do you agree with me that the front of your car could have been across the center of the road when impact occurred?
>
> A. It could -- I mean, it's hard to say, but yes, it could have been.
>
> Q. Okay. And you told me in your deposition that the front could have been across the center of the road, but it's hard to tell because there's no marking on the center of the road.
>
> A. Correct.

(Doc. 52, pp. 80-81). When the Government later asked Chambers to clarify if she thought she was over the center line, she couldn't give a definitive answer:

> Q. So you mentioned earlier that you could have been over the centerline when you pulled out of the 220 County Road driveway that day. Do you think that you were?
>
> A. I'm not sure because in the center of the vehicle it's hard to tell where the bumper is going to be at every given point.

(*Id.*, p. 133). Hearing Chambers' statement about being in "the center of the vehicle," the court followed up by asking Chambers to describe the struggles caused by driving while straddling the center console:

> THE COURT: Almost done, Ms. Chambers. I just have two things I want to follow up on. The first one is, the first time Ms.

> LaGanke questioned you, the very last answer you gave her was talking about your ability to see the bumper from the center. So I just want to make sure I understand. So this is what I was thinking about when you testified that you sat in the center.
>
> THE WITNESS: Yes.
>
> THE COURT: Like when I sit on the left it's easier for me to see the line and my front bumper because that's where I am at.
>
> THE WITNESS: Right.
>
> THE COURT: If I am turning into a parking space, I have to ask my wife to look at that because I'm farther away from it.
>
> THE WITNESS: Right.
>
> THE COURT: So what you're saying is, is when you moved to the center, since you're not up against that side anymore, it's just harder to see like a line in that bumper, right?
>
> THE WITNESS: Yes.

(Doc. 52, p. 145). The court then asked Chambers to explain the impact the tree had on her right turn:

> THE COURT: Okay. And the second thing was Exhibit 15, if you don't mind pulling that up. I just wanted to get your explanation on one sentence in your statement. And it's right here (indicating) it says, I turned right, couldn't see past the large oak, so you have to pull out in my lane. Now, you have to pull out in your lane, anyway, because you're going.
>
> THE WITNESS: Right.
>
> THE COURT: So what did you mean because I couldn't see past the large oak, I had to pull out in my lane?
>
> THE WITNESS: I always try to pull up a little bit and ease into the road.

> THE COURT: Okay.
>
> THE WITNESS: And then I will proceed when I see nothing's coming. So that's what I was doing was, just easing into the road a little bit.
>
> THE COURT: Okay.
>
> THE WITNESS: And just making sure no one was coming.

(*Id.*, p. 146). This answer clarified Chambers' earlier statement to the court that she was "three-quarters of the way in [the] road" when she first saw Sperger coming over the hill:

> THE COURT: Let me clarify. Your testimony today is the front of your vehicle was in the road at the moment you saw Mr. Sperger?
>
> THE WITNESS: I was actually three-quarters of the way in road when I seen Mr. Sperger –
>
> THE COURT: Okay.
>
> THE WITNESS: -- on the day that it actually happened.
>
> THE COURT: All right. So even if your rearview mirror, at least part of, you said three-quarters of the way in.
>
> THE WITNESS: My vehicle was three-quarters of the way in the road –
>
> THE COURT: Okay.
>
> THE WITNESS: -- the back, the back left, the back right tire was still in the driveway basically.
>
> THE COURT: Okay.
>
> THE WITNESS: I didn't manage to get squared up in the road. I was trying to, you know, maneuver and get over. This is why I'm saying the tree became an obstacle because I couldn't get out of his way.

> THE COURT: There was nowhere for your car to go
>
> THE WITNESS: Exactly.
>
> THE COURT: -- you would have run into the tree.
>
> THE WITNESS: I was just past this side of the tree.
>
> THE COURT: Okay.

(Doc. 52, pp. 74-75).

The court recounts this testimony to highlight three of Chambers' admissions. First, Chambers admits that she pulled into the narrow 14-foot road to see around the tree. Second, Chambers admits that she could have been over the center line, but from her vantage point straddling the center console, she couldn't tell where her front left bumper was in relation to the center. Third, Chambers admits that she didn't have time to "square up" before the collision, meaning that she was still in a right turn motion. These admissions, coupled with both riders' testimony that the collision happened on Sperger's side of the road as Chambers was still turning right, tip the scales heavily in favor of the collision happening on Sperger's side of the road.

2. *Physical evidence*: Several pieces of physical evidence also suggest that Chambers' Jeep was still turning back toward the right lane when Sperger hit.

First is the damage pattern on the Jeep.





The pictures show that the impact damage to Chambers' Jeep is concentrated behind the headlight, above the bumper. The front of the Jeep, including the left headlight, are virtually undamaged. This suggests that Sperger hit the Jeep with his motorcycle behind the headlamp at an angle, as if the Jeep was turning right—not head on, as if the Jeep were straight in its lane.

Second is the damaged left front wheel and tire:



The court agrees with Allen Powers' testimony that, to take such a large chunk of the left front wheel, some part of Sperger's motorcycle had to directly hit the wheel. And for that to happen, the wheel had to be exposed during a right turn:




Third is the impact on Sperger's motorcycle. Almost all damage was to the left side. And Sperger, his motorcycle, and debris from his motorcycle were deflected off the road to the right:




This suggests that Sperger glanced off the front left side of the Jeep as it turned back to the right; Sperger did not hit a straight-facing Jeep head on.

The final point is more geometry than physical evidence. As mentioned, Chambers testified that (a) she pulled nearly perpendicular to the county road to make her turn, and (b) she pulled into the road to see around the tree,

making her "three-quarters" into the road when she first saw Sperger. As Powers demonstrated, a similarly sized vehicle would cross well into the opposing lane if it turned from a purely perpendicular starting point:





Even if we assume that Chambers started her turn at some angle to the right, the geometry suggests that she could not have pulled forward and right to see around the tree without crossing the center line. Then, to straighten out in the right lane, Chambers would have to cut her wheels to the right, thus exposing the front left wheel and bumper to the type of damage the Jeep suffered from Sperger's motorcycle.

—

In sum, the eyewitness testimony and physical evidence strongly point to the same conclusion: Chambers pulled out of the driveway and into Sperger's lane of traffic, and Chambers didn't have time to complete her right turn and straighten her Jeep into her own lane before Sperger hit her Jeep.

In the court's opinion, the only contrary evidence was Dr. Alan Lynch's expert testimony that fluid spatter from Sperger's motorcycle proved the impact occurred on Chambers' side of the road. So the court explains why Dr. Lynch's testimony does not tip the scales back in the Government's favor below.

**b) Fluid Spatter**

1. *The theory:* Trooper Brody Moses worked the accident scene with his body camera turned on. About 30 minutes after the collision, two wet patches can be seen in Moses's body camera footage, as he walks up the hill. Dr. Lynch labeled them like this in his report:




Dr. Lynch opined that the wet spots were "liquid spatter originating from the westbound motorcycle." (Doc. 49-343, p. 11). Dr. Lynch opined that the V-shaped wet spots behind Points A and C indicated vehicle direction. Importantly, Dr. Lynch opined that Point A was the point of impact—a point both sides agree is located on Chambers' side of the road.

Dr. Lynch further testified that he could see a tire mark in the body camera footage that suggested to him that Sperger drove into Chambers' lane. Dr. Lynch marked the proposed track as "D" in the picture below:



(*Id.*, p. 12).[1] When asked why Sperger would steer into Chambers along Path D, Dr. Lynch opined that Sperger may have suffered from "target fixation," a phenomenon in which a driver's eyesight "is following the hazard versus following trying to avoid the hazard." (Doc. 50, p. 7).

2. *Analysis*: Having reviewed the evidence and testimony, including the body camera footage, and having personally questioned Dr. Lynch about his opinion, the court rejects Dr. Lynch's theory that Sperger drove along Path D and struck Chambers at Point A, thus causing two large pools of vehicle fluid spatter that Dr. Lynch labeled A and C. The court finds it more likely that Pools A and C were forms of condensation that had nothing to do with the collision. The court makes this fact conclusion for five reasons.

First, no one at the scene noticed vehicle fluid on the ground or on the vehicles. Chambers did not remember seeing any fluid on her Jeep. (Doc. 52, pp. 91). Gerbig testified that he did not see any "fluid dumps or any fluid spills" that day, and he would have noticed if fluid was there. (Doc. 49-475, p. 67). Gerbig also testified that he looked at the Jeep and the motorcycle and could not remember seeing fluid on either. (*Id*. pp. 68, 70). Nor did he smell any fluid. Picard similarly testified that he did not notice any puddling or pooling of fluids. (Doc. 49-474, p. 32). And a third member of the motorcycle group, Cary Uecke, bluntly said: "I know there wasn't nothing leaking from any vehicle because that wasn't -- no liquid on the road." (Doc. 49-477, p. 29).

If we could expect someone to notice two large pools of fluid on the ground and record their presence, it would be Trooper Moses. We know that Trooper Moses walked the area, as it was his front-facing body camera that captured the wet spots Dr. Lynch relies on. Yet Trooper Moses made no such finding of vehicle fluids in his report. Moses later testified: "I don't see anything in the report that would indicate that I found something that I would need to put on there." (Doc. 49-473, p. 38). He continued: "If I would have seen something that seemed to pertain to this direct crash, I would have most likely made note of it or there would have been some mention." (*Id.*, p. 39).

---

[1] Dr. Lynch noted that he increased this picture's brightness by 20% and the contrast by 30% because of the tree's shade. (Doc. 49-343, p. 12).

Second, Dr. Lynch could not identify what type of fluid the motorcycle lost or the container from which it came. Dr. Lynch admitted that he had not looked at Sperger's motorcycle, the 50 or so photographs of Sperger's motorcycle (docs. 49-34, 49-35), or at the motorcycle's parts manual before opining that the fluid came from the motorcycle. So at trial, the court asked Dr. Lynch to look through the photographs and opine which compartment the fluid came from. (Doc. 50, pp. 75-77). When he finished, this exchange occurred:

> THE COURT: Here's my question, Dr. Lynch: Having now seen the photographs of the motorcycle, my biggest struggle in determining whether these spots prove point of impact is: I see nothing in the pictures from the Jeep or the motorcycle that allows me to say, Here's where that fluid came from. Both vehicles seem to be bone dry. And you only have one small puncture to one tank on the motorcycle. And I apologize, Mr. Sperger, for saying this in advance, so I'm sorry, but it seems to me -- and you can tell me why I'm wrong -- having seen the motorcycle, the majority of the damage and impact seems to have been to Mr. Sperger's leg, not the motorcycle. I just don't understand at that impact moment how that much fluid escaped from somewhere on the motorcycle where I just can't see it. There's no -- there's no pieces of the motorcycle on the ground from where a tank exploded. There's no plastics there. There's none of the liquid on the motorcycle, none of the liquid on the Jeep. What explains that amount of liquid being in those two spots without any proof otherwise of where it came from?
>
> THE WITNESS: In the photographs I have seen, I haven't seen that yet, but, again, I think this may be the -- I don't recall seeing these, but if I did -- but I didn't see any evidence, but I also didn't see detailed locations where calipers were or the front tire of the motorcycle.
>
> THE COURT: Do you really think that the calipers alone could have deposited that amount of fluid in two different spots in what would have happened in an instant?

> THE WITNESS: Maybe -- as far as a caliper, I don't know. And I had that as my testimony. I really don't know where the source came from.

(*Id.*, pp. 77-78). As for his original theory that the pools might be brake fluid, Dr. Lynch later admitted after being shown the parts manual that the brake fluid volume was stored in a reservoir on the right side of Sperger's motorcycle, so he "would not expect it to be damaged." (Doc. 50, p. 80). So Dr. Lynch is left with the one small puncture to one tank the court showed him at trial:



(Doc. 49-34, p. 21) (arrow added). The court finds it implausible that this small hole could have been the source of either pool of fluid because the motorcycle would have immediately careened away from the road into the ditch, leaving no time for such a large amount of fluid to escape and pool.

That leads to the court's third concern: Even if a small hole in one tank caused one of the fluid pools, how did it cause both? Again, here's the scene:




Even if you give Dr. Lynch the benefit of the doubt that the collision caused Pool A, he still must explain what impact or event caused the equally large pool he marked C. There was no fluid spatter between the two pools, so under Dr. Lynch's theory, there had to be a second event that ruptured a second source of fluid at Point C. But when asked, Dr. Lynch couldn't explain the second pool. He instead admitted, "I don't really – I don't think I have developed an opinion on how C was developed." (Doc. 54, p. 49).

Fourth, the alleged vehicle fluid disappeared. Dr. Lynch testified that he relied on the Traffic Crash Investigation Manual to support his fluid spatter theory. When discussing vehicle fluid puddles, the TCI Manual says that "[p]etroleum products leave long lasting stains," and as an illustration, it shows stains plainly visible after one year. (Doc. 49-367, p. 9). But neither Dr. Lynch nor the Government produced any photographs of the alleged vehicle fluid spatter stains existing after the day of the collision. On the other hand, many pictures are void of the "long lasting stains" the manual suggests. For example, here is a snapshot of Trooper Moses's body camera footage, with X's marking Points A and C:




(Doc. 49-160, p. 1). And here is Powers's marking of the same two spots a year later:



Whatever substance made Pools A and C the day of the collision completely disappeared by the time Powers arrived, in contradiction to the TCI Manual's suggested outcome for vehicle fluid puddles or pools. Respectfully, Dr. Lynch's attempt to explain away the inconsistency between his opinion and the manual he based that opinion on was not persuasive. *See* (doc. 50, pp. 73-74).

Fifth and finally, Dr. Lynch's opinion conflicts with the physical impact evidence. If Dr. Lynch is right that Chambers had time to square her Jeep back into the right lane before impact, and Sperger veered into Chambers' lane because of "target fixation," then you would expect a more head-on collision with the front of the Jeep, particularly when the V-pattern from Point A points straight down the road—not at an angle to the right ditch:




In fact, when the court had Dr. Lynch draw the V-pattern from Point A at trial, he agreed that the court's suggestion that the V-pattern suggested the impact was "[k]ind of head on, if not a little more from the motorcycle's lane toward the jeep" was a "fair description." (Doc. 54, p. 47).

But as we've seen, the Jeep had no damage to its front, and no fluid from a direct hit and explosion. Rather, the damage was behind the headlight and on the front left tire, indicating that Sperger hit Chambers while she was still turning her wheel to the right (as the eyewitnesses said). And the glancing right-ward trajectory of Sperger and his motorcycle, rather than up and over the Jeep, further suggest that Sperger hit Chambers in the left side as she was turning right (as the eyewitnesses said). When confronted with these points, plus the chunk missing from the front left wheel, Dr. Lynch struggled to explain the Jeep's trajectory and never offered a drawing of the angle of impact. *See* (doc. 50, pp. 20-28).

—

To sum it all up, eyewitness testimony, physical evidence, and Powers's expert testimony all suggest the same cause of the collision: Chambers pulled onto the county road and into Sperger's lane to see around the tree as she turned right, and Chambers was unable to complete her turn into her own lane before Sperger collided with her. The only evidence that suggests the collision happened on Chambers' side of the road was Dr. Lynch's fluid spatter opinion, which the court rejects as implausible for the five reasons mentioned above. The court thus finds that the collision happened on Sperger's side of the road.

This factfinding means that Chambers violated at least two rules of the road: (1) she was not driving on the right side of the road at the time of the collision, in violation of Ala. Code § 32-5A-80, and (2) she did not yield the right-of-way to a vehicle approaching on a road that she was entering from a private driveway, in violation of Ala. Code § 32-5A-114. Because Chambers had a duty to follow these rules, Sperger proved that Chambers violated these rules, and Chambers' violations caused Sperger's injuries, the court finds that Sperger proved his negligence claim by a preponderance of the evidence. *See Parker Bldg. Servs. v. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005) ("Proof of a violation of the statute is proof of negligence."). The court further finds that the Government failed to prove that Chambers was contributorily negligent. So the court will award Sperger damages in Part B(1).

**2. Krista Sperger's consortium claim**

Krista separately alleges that Chambers' negligence injured her right to consortium. In Alabama, "[a] loss-of-consortium claim is a derivative claim of a noninjured spouse, arising out of the injury to the injured spouse." *Jenkins v. State Farm Mut. Auto. Ins. Co.*, 30 So. 3d 414, 418 (Ala. 2008). The Government concedes that, if Sperger proved his negligence claim, then Krista is necessarily entitled to a damage award for her loss of consortium. (Doc. 58, p. 36). Because the court found that Sperger proved his negligence claim, the court finds that Krista has proved her loss of consortium claim and will award her damages in Part B(2).

## B. Damage Awards

### 1. John Sperger's damages

Sperger seeks two awards: (a) payment of past medical expenses and (b) payment of noneconomic loss for past physical pain and mental anguish, future physical pain and mental anguish, and permanent injury and disfigurement. The court takes the categories in that order.

#### a. Past medical expenses

The parties contest only one past medical expense: the $200,608.00 that Sperger owes Aviation West Charters for the air ambulance transport from Georgia to Wisconsin. The Government concedes that, if Sperger proved his claim, then he is entitled to the remaining medical expenses he seeks:

| **Item** | **Amount** |
|---|---|
| Anthem BCBS subrogation | $ 382,375.83[2] |
| Floyd Physicians, LLC | $ 15,443.00 |
| Etowah Emergency Physicians | $ 1,500.00 |
| G. Marc Wetherington | $ 3,001.53 |
| Ripon Medical Center | $ 603.00 |
| Chiroplus Healthcare | $ 450.00 |
| **Total** | **$ 403,373.36** |

(Doc. 58, p. 20, n. 15). The court will therefore award this amount and now decide whether to also award the air ambulance expense.

[2] While Sperger claims that the reasonable value of the services Floyd provided was $621,463.50, he accepts that "the Court may reduce the recoverable amount for Floyd Medical Center to $382,375.83." (Doc. 57, pp. 28-29). The court will therefore award this amount for Anthem BCBS subrogation.

To be entitled to recover the air ambulance expense, Sperger must prove three things: (1) Aviation West charged a reasonable amount; (2) the air ambulance flight was necessary; and, (3) Chambers' negligence proximately caused the air ambulance flight. *See Ex parte Hicks*, 537 So. 2d 486, 489-90 (Ala. 1988) ("the general rule regarding the recovery of medical expenses, including hospital expenses resulting from personal injuries, is that a plaintiff may recover those medical expenses that are reasonable and necessary"); Ala. Pattern Jury Instr. Civ. 4.15 ("You must decide if the treatment was reasonably necessary, that the expenses for it were reasonable in amount, and that the need for the treatment was caused by (name of defendant)'s conduct.").

The Government does not contest the reasonableness of the charge, (doc. 58, p. 20), so the court assumes that Sperger proved that element. The court thus focuses on necessity and proximate cause. It starts by detailing how the parties briefed the issue. As mentioned in Part I, the court finds as a matter of fact that Sperger's family asked Sperger's doctors to move Sperger from Georgia to Wisconsin for inpatient rehab because of his mental, emotional, and physical struggles while in Georgia. At the end of trial, the court asked the parties to brief whether Sperger's mental health struggles made the transport legally necessary, and if so, whether the Government caused the necessary transport. (Doc. 50, pp. 111-13). The Government did not brief the necessity issue; it argued only that it could not foresee the family's decision to request air transport for mental health reasons at the time of the collision, so the Government could not have proximately caused the transport. (Doc. 58, pp. 21-25). Sperger addressed the necessity issue in his brief (doc. 57), then replied to the Government's foreseeability argument in reply (doc. 62, pp. 6-8). The Government did not address the necessity element in its reply. (Doc. 61).

1. *Necessity*: The court finds for Sperger on necessity for two reasons. First, the Government offered no evidence or argument on the issue. The Government did not present expert testimony at trial to rebut Dr. Beck's testimony that the transport was "medically reasonable and necessary." (Doc. 49-478, p. 12). When the court asked the parties to address necessity in their post-trial briefs, the Government made no argument. When Sperger argued the issue in his post-trial brief, the Government again was silent in reply.

Second, Sperger's unrebutted evidence proves necessity by a preponderance. Sperger was struggling mentally and emotionally while at Floyd. He had recurring hallucinations, including a hyperbaric chamber door closing on him. Sperger suffered from a false belief that his family was hiding from him and that his wife left him to remarry. Krista testified that while Sperger was suffering from ICU delirium, Sperger was "[n]ot really there," and that "he kind of looked through us, like he didn't even know who we were. Like we were strangers." (Doc. 53, p. 270-71). Once Sperger could communicate, he called his wife multiple times a day. Plus, Sperger stopped eating, losing between 20 (Sperger's testimony) and 42 pounds (Floyd records). *See* (doc. 57, pp. 17-18 (collecting the record cites)).

So while it's true that the Spergers asked for the transfer, that doesn't mean the transfer was not medically necessary. Dr. Beck testified that patients like Sperger "have some issues with depression" and "posttraumatic stress." (Doc. 49-478, p. 53). Dr. Beck testified that moving Sperger closer to his family and support structure "would help with his recovery." (*Id.*, p. 55). Dr. Beck thus opined that moving Sperger from Georgia to Wisconsin for inpatient recovery was "medically reasonable and necessary,"[3] (*id.*, p. 12-13), and Floyd arranged the transfer. The Government presented no contrary opinion evidence.

The court finds that Sperger's mental, emotional, and physical struggles while recovering at Floyd, combined with Dr. Beck's testimony that Sperger's move to Wisconsin was medically necessary to alleviate those struggles, proves necessity under Alabama law by a preponderance of the evidence.

2. *Proximate cause/foreseeability*: Rather than argue that the transport from Georgia to Wisconsin was unnecessary, the Government argues that the air ambulance "expenses were not foreseeable when the negligent acts at issue in this case occurred." (Doc. 58, p. 25). The Government fleshes out its foreseeability argument like this:

> When Ms. Chambers turned right out of the driveway at 220 County Road 114, a prudent and experienced person, fully acquainted with all the circumstances, would have thought it

[3]Under Alabama law, a plaintiff's treating physician is "well qualified to give an opinion as to whether the care given to [the plaintiff] was necessary and whether the charges for that care appeared to him to be 'fair and reasonable.'" *Dairyland Ins. Co. v. Jackson*, 566 So.2d 723, 727 (Ala. 1990).

> reasonably possible that if Ms. Chambers crossed into the oncoming lane of travel that an oncoming motorist could be severely injured. The same prudent and experienced person would have also thought it reasonably possible that those severe injuries could require hospitalization followed by inpatient rehabilitation. That same prudent and experienced person, however, knowing all the circumstances of County Road 114 would not have thought it reasonably possible that the injured motorist would have an out-of-state family who made the personal choice to transport the motorist by air ambulance hundreds of miles away from the accident site, not to receive acute, specialized care, but to receive inpatient rehabilitation at a location closer to the motorist's family. *See Ex parte Wild Wild W. Soc. Club, Inc.*, 806 So. 2d 1235, 1241 (Ala. 2001) ("[F]oreseeability must be based on the probability that harm will occur, rather than the bare possibility.") (quotations omitted).

(*Id.*, pp. 24-25). The Government's argument about the foreseeability of an "out-of-state" family making a "personal choice" about a family member's care misses the mark because the Government is aiming at the wrong mark.

Proximate cause and foreseeability are tested against the plaintiff's injury, not the means or expense chosen to treat the injury. The Government's citation above says so: "Foreseeability must be based on the probability that harm will occur, rather than the bare possibility." *Ex parte Wild Wild W.*, 806 So. 2d at 1241. Digging a little deeper, the state supreme court has also said:

> Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred. The requirement of foreseeability is imposed to preclude a finding of liability when the defendant's conduct was part of the causal chain of events leading to the injury but the resulting injury could not have been reasonably anticipated by the defendant. Foreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence could have been anticipated.

*City of Birmingham v. Benson*, 631 So. 2d 902, 906-07 (Ala. 1993) (quoting *Thetford v. City of Clanton*, 605 So. 2d 835, 840 (Ala. 1992)).

The Alabama Pattern Jury Instruction says it plainly: "You must decide if the treatment was reasonably necessary, that the expenses for it were reasonable in amount, and that the need for the treatment was caused by (name of defendant)'s conduct." APJI Civ. 4.15.

In short, proximate cause focuses on the foreseeability of the plaintiff's injury, not the foreseeability of the decisions the doctors and families will make on how to treat the injury. Of course, that doesn't give doctors and families free rein to spend as they please. If it's determined that the plaintiff's injury was a foreseeable consequence, the Defendant can still attack the decisions on how the injury was treated, where the injury was treated, and how much it cost to treat the injury under the reasonable and necessary elements that the Government chose not to contest. *See id.*

Applied here, the question is whether it was foreseeable that Sperger could suffer PTSD, delusions, depression, and/or undernourishment because of the collision and its aftermath. Dr. Beck testified that it was:

> It can wear on patients. We do see patients have issues with posttraumatic stress. We also do see that patients have some issues with depression. But we see that with long-term hospitalized patients in general. But, yeah, there's -- there's a lot going through it and -- and moving around from all the different units as well being in the ICU for a while and the general floor. All that can contribute to different levels of that.

(Doc. 49-478, pp. 53-54) (answering whether going through Sperger's numerous procedures is "a pretty traumatic thing"). Based on this testimony, and the rest of the evidence presented at trial, the court finds that, at the time of the collision, the Government could have foreseen the injuries that led to the decision to medically transport Sperger from Georgia to Wisconsin because doing so would increase the likelihood of his recovery from ongoing trauma, delusions, depression, and similar injuries.

While the Government never uses the term "intervening act" in its brief (doc. 58), in an abundance of caution, the court further finds that the Sperger family's "personal choice" to request Sperger's transfer from Georgia to Wisconsin was not an intervening act that vitiates the Government's liability because the family's choice was neither unforeseeable nor can it be deemed the sole cause of Sperger's trauma, delusions, depression, and similar injuries. *See Haddan v. Norfolk S. Ry. Co.*, 367 So. 3d 1067, 1072 (Ala. 2022) ("In order to be an intervening cause, a subsequent cause also must have been unforeseeable and must have been sufficient in and of itself to have been the sole 'cause in fact' of the injury."). To the contrary, the evidence suggests that the transfer decision had the intended positive effect.

—

For these reasons, the court will award Sperger $200,608.00 for the cost of the air ambulance transport, plus the $ 403,373.36 in past medical expenses that the Government does not contest. This results in a total award of $ 603,981.36 for past medical expenses.

**b. Non-economic losses**

The court now turns to Sperger's claims for non-economic damages. Alabama law provides distinct awards for (1) past physical pain and mental anguish, (2) future physical pain and mental anguish, and (3) permanent injuries and disfigurement. Below, the court decides an award for each category based on the facts, keeping in mind that, under Alabama law, there is no yardstick for pain and suffering damages and that computing such damages in proportion to the plaintiff's medical bills is frowned upon. *See Campbell v. Kennedy*, 275 So. 3d 507, 518 n.4 (Ala. 2018). While the court asked the parties to provide comparator cases and awards, the court will not use them to calculate its award for each category because the state supreme court has said that, when judging awards for pain and suffering, "a comparison of jury verdicts in similar cases is not the standard for determining whether a jury verdict should be reduced." *Id.* at 518. The court uses only the facts of this case applied to Alabama law.

1. *Past physical pain and mental anguish*: Sperger experienced his greatest physical, mental, and emotional pains in the time between the June 2021 collision and the January 2026 trial.

Sperger's pain started immediately. As Sperger lay on the ground, he looked down to see his foot "flipped around the other way." (Doc. 53, p. 186). He was then taken to Floyd, where he arrived hemorrhaging. While at Floyd, Sperger received five surgeries to his hip, leg, and ankle, and he spent 15 days intubated with five days of failed extubations. Sperger suffered bilateral strokes that caused some paralysis and speech problems. Sperger suffered delirium that caused him not to recognize his family at times, and fear that his family was abandoning him at others. Sperger stopped eating and lost between 20 and 42 pounds.

As discussed, Sperger's emotional plight was so bad that his family and treating physician decided to fly him to Wisconsin after a painful skin graft in the hopes that Sperger would improve. He did, but not without severe hip pain during his flight and subsequent inpatient treatment at Froedtert.

When Sperger was finally released, a new emotional torment awaited at home. Sperger spent the first two months bedridden in his dining room without a shower or the ability to lay in a position without pain. Sperger would cry nightly and contemplate suicide. Sperger's thoughts were serious enough to cause his wife and son to hide his firearms and ammunition for over a year. Recovery during this time was slow. Sperger spent weeks crawling backwards, then moving in a wheelchair, before ultimately walking and driving.

Once Sperger started rehab, certain aspects of his life improved. But there was still pain. Sperger's clawed toes required an insert. Sperger received mental and physical therapy and counseling, chiropractic care, massages, and acupuncture. Sperger had to sell his home and move to a smaller lot because he could no longer maintain his larger one.

Again, there is no yardstick for measuring such pain and suffering. But the court finds two periods particularly excruciating: the weeks spent at Floyd in surgery and post-traumatic stress, and the first six months at home. The court deems these periods similarly compensable at $400,000 and $350,000 respectively. The court finds that the remaining time before trial was painful,

but not to same extent, and thus awards $100,000 for that period. Adding these three periods together gives a total award of $850,000 for past physical pain and mental anguish.

2. *Permanent injuries and disfigurement*: Before the court can award damages for future pain and suffering, the court must identify and separate out Sperger's permanent injuries and disfigurements to ensure that none of Sperger's future-facing damages are double counted. The court finds three conditions that warrant a separate recovery. First, doctors placed hardware in Sperger's tibia, fibula, femur, and pelvis that will never be removed. This hardware will affect his gait for life. Second, Sperger's three clawed toes require Sperger to live with an insert and to walk painfully on his toes and deformed nails. This condition is permanent. Third, Sperger's skin graft scar, hip scar, fasciotomy scar, as well as the divot to the back of his head may improve somewhat over time, but all are permanent.

Again, it is difficult to place a price tag on permanent injuries. While the court finds this category to be the least compensable of the three, there is no doubt that the body Sperger has today is not the body he would have had but for the collision. The court thus awards $180,000 as a fair and reasonable amount for Sperger's permanent injuries and disfigurements.

3. *Future physical pain and mental anguish*: Finally, the court finds that Sperger proved two forms of future medical pain or mental anguish to a reasonable certainty. First, Sperger proved that his physical improvement has plateaued, and that he can expect pain in his left foot, ankle, knee, and hip for the rest of his life. Sperger proved to a reasonable degree of medical probability that he will suffer arthritis in his hip and accelerated knee wear.

Second, Sperger proved to a reasonable degree of certainty that he will suffer mental anguish for the rest of his life. At times, Sperger still suffers from delirium, depression, and anxiety. Sperger legitimately fears the threat of future hip replacement and other procedures that could cause severe pain with unknown results. Sperger also mourns the loss of his active lifestyle and the retirement he planned around motorcycling.

The court understands that Sperger's future pain is less than the severe pain he suffered in the first year, which counsels against an award as large as

the past pain award. That said, Sperger has an expected life span of more than 20 years, so this pain will last for much longer, and it could get worse with age. So the court awards $425,000, a number slightly above Sperger's worst period of past pain, in recognition of the longer period.

—

For these reasons, the court finds that Sperger suffered these damages:

| **Category** | **Award** |
|---|---|
| Past Medical Expenses | $ 603,981.36 |
| Past Physical Pain & Mental Anguish | $ 850,000 |
| Future Physical Pain & Mental Anguish | $ 425,000 |
| Permanent Injuries & Disfigurement | $ 180,000 |

As stated, the court did not consider other awards when calculating these damages. But the Eleventh Circuit decides whether FTCA damages are excessive by comparing them to damages sustained by the relevant State's courts. *See Bravo v. United States*, 532 F.3d 1154 (11th Cir. 2008). The closest state case the parties point to is *Campbell v. Kennedy, supra*. Plaintiff Eduard Kennedy was driving a passenger van that collided with a motor grader driven by Defendant Campbell. Kennedy suffered severe injuries that required surgery to install a rod to repair his femur and screws to repair his pelvis. Kennedy was also on a liquid diet for six weeks because the wreck broke his jaw. While Kennedy ultimately began walking with crutches, walking caused him pain, and he could not stand for long periods. Kennedy (27) had to give up certain physical activities like basketball. The jury awarded Kennedy a total of $3 million; $77,111.25 for past medical expenses and the rest for past and future non-economic damages. The state supreme court found that the award was neither flawed nor excessive. 275 So. 3d at 515-19.

The court finds that the cases are comparable in that both Sperger and Kennedy suffered severe hip and legs injuries requiring surgery. At first blush, the court believes that Sperger's past physical pain and mental anguish were more extreme because Sperger also suffered strokes, PTSD, and ICU delirium.

But the court cannot know everything that Kennedy suffered because the court doesn't have access to Kennedy's trial record. Nor can the court know what percentage of the award the jury attributed to past versus future pain and suffering. It is possible that most of Kennedy's award was for future pain and suffering because he was only 27 at the time of the accident; half of Sperger's age at the time of his accident (54). Regardless, Kennedy's non-economic award of $2.92 million doubles Sperger's non-economic award of $1.455 million. So the court sees no argument that its award of noneconomic damages is excessive (as the Circuit Court views excessiveness).

**2. Krista Sperger's damages**

Krista seeks damages for loss of consortium. Alabama law defines consortium as "conjugal fellowship of husband and wife, and the right of each other to the company, society, co-operation, affection, and aid of the other in every conjugal relation." *Hinson v. King*, 603 So .2d 1104, 1106 (Ala. Civ. App. 1992) (quoting Black's Law Dictionary, 280 (5th ed. 1979)). Like the pain and suffering damages discussed above, "compensatory damages for loss of consortium due to injuries to a spouse cannot be ascertained by any fixed standard, but are left to the sound discretion of the jury." *Id.* And the award of pain and suffering damages to the injured spouse does not necessarily grant consortium damages to the non-injured spouse; consortium damages must be proved and awarded separately. *Id.*

The court finds that Krista has sufficiently proved two consortium theories. The first is Krista's loss of society and companionship with John, especially during the first year after the collision. Living in Wisconsin, Krista lost the physical company of her husband for much of his recovery time at Floyd. When Krista came to Georgia, Sperger didn't recognize her. Sperger then fell into delirium that made him think that Krista had left him, and he would call her repeatedly, thinking that Krista was trying to leave him. Such times were emotionally taxing. That taxation continued when Sperger came home. He lived downstairs in the dining room for two months, and Krista heard him crying out in pain, sometimes contemplating suicide. Krista lost her husband's emotional and sexual affection during these early days. Even as Sperger has recovered, Krista has lost much of the society and companionship she shared with her husband in outdoor physical activities.

Second, Krista has lost some of John's services. Not only must Krista shoulder more of the physical burden of caring for the home, she oversees the financial and insurance decisions because of Sperger's strokes.

Again, there is no yardstick for awarding emotion-based damages, and the court is leery of putting a price tag on them. But it must; and the court finds that Krista has proved $175,000 in consortium damages; $75,000 for the severe loss of companionship Krista suffered in the first year, and $100,000 for the additional burden Krista must shoulder for the rest of the couple's marriage.

## CONCLUSION

For the reasons stated within, the court will enter judgment for John Sperger on his negligence claim and award him these damages:

- Past medical expenses: $603,981.36
- Past physical pain and mental anguish: $850,000
- Future physical pain and mental anguish: $425,000
- Permanent injuries and disfigurement: $180,000

The court will also enter judgment for Krista Sperger on her loss of consortium claim and award her $175,000 in damages.

The court will enter a separate final order that carries out this ruling and closes this case.

**DONE** and **ORDERED** on September 30, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE